T.C. Memo. 1997-409


UNITED STATES TAX COURT


GRIFFIN PAPER CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

GREAT NORTHERN NEKOOSA CORPORATION
AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17763-95, 18532-95.     Filed September 16, 1997.


     G owned all of L's stock.  L's primary asset was a
sawmill, which was operating at a loss, and L desired
to find a partner with whom to build a pulp mill to
enhance the sawmill's productivity.  In 1981, G and N
agreed that G would recapitalize L, and that L would
build the pulp mill after N transferred to L funds in
exchange for an ownership interest therein.  Pursuant
to the agreement, G received 32.8 percent of L's
preferred stock and 5 percent of L's common stock, and
N received the rest of L's stock.  All of G's L stock
was subject to simultaneous reciprocal options,
exercisable at any time after 1988, under which G could
put its L stock to N in return for $31.75 million plus
5 percent of L's retained earnings on the date of
exercise, and N could call G's L stock at the same

price.  On Jan. 2, 1989, G notified N that G was exercising its put, and, later that year, G transferred its L stock to N in exchange for $31.75 million (L had negative retained earnings).  G and R argue that G sold its L stock to N in 1989.  N argues that the sale occurred in 1981.  Held: The sale occurred in 1989.

Dean Holbrook, Lance G. Harris, and John G. Lipsett, for petitioner in docket No. 17763-95.

William L. Goldman, Christopher Kliefoth, Joni Lupovitz, and Philip Alva McCarty, for petitioner in docket No. 18532-95.

Stephen M. Miller, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge[1]:  These cases are before the Court consolidated for purposes of trial, briefing, and Opinion.  See Rule 151.[2] Griffin Paper Corp. (Griffin) petitioned the Court to redetermine a deficiency of $3,703,147 in its 1989 Federal income tax.  Great Northern Nekoosa Corp. (GNN) petitioned the Court to redetermine a deficiency of $357,753 in its 1989 Federal income tax.

---

[1] The trial of these cases commenced under Judge Thomas B. Wells.  After hearing part of the testimony, Judge Wells recused himself and the Court assigned these cases to Judge David Laro. The parties agreed to let the testimony not heard by Judge Laro stand, and neither side asked Judge Laro to recall any witness who testified before Judge Wells.

[2] Rule references are to the Tax Court Rules of Practice and Procedure.  Section references are to the Internal Revenue Code in effect for the year in issue.

The deficiencies stem from Griffin's sale of certain stock to GNN. We must determine whether this sale occurred in 1981 or 1989. GNN argues that the sale occurred in 1981. Griffin and respondent argue that the sale occurred in 1989. We hold that the sale occurred in 1989.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations and exhibits submitted therewith are incorporated herein by this reference. Griffin and GNN are corporations whose principal places of business were in New York, New York, and Atlanta, Georgia, respectively, when they petitioned the Court.

Griffin is the successor to Leaf River Paper Co. (LRPC). LRPC was organized in 1971 under the laws of Delaware, and it changed its name to Griffin in 1982 (hereinafter we refer to LRPC as Griffin.) Griffin's sole shareholder is a Finnish company named Kymi Kymmene Oy (KKO). KKO is one of the largest forest product companies in Finland; it produces and sells in Europe forest products such as pulp and paper products. KKO organized Griffin as a nonoperating holding company to manage KKO's interests in the United States. Until December 31, 1981, Griffin had a wholly owned subsidiary named Leaf River Forest Products, Inc. (LRFP), which was formed in 1975 to own and operate a sawmill in New Augusta, Mississippi.

GNN was organized in 1898 under the laws of Maine.  GNN is one of the world's largest producers of pulp and paper, and it is a major U.S. paper distributor and envelope manufacturer.  GNN became the sole owner of Leaf River Corp. (LRC) on December 31, 1981.  LRC was organized in 1981 under the laws of Delaware.

KKO is a major user of pulp.  In or before 1970, KKO ascertained that it needed additional sources of pulp, and it conducted studies which revealed that woodlands in Mississippi were a promising source of raw material and a good location for a pulp mill.  KKO purchased land in Perry County, Mississippi, on which it intended to build and operate a pulp mill.

In 1975, KKO concluded that it should build the pulp mill in two steps.  First, KKO would build a sawmill.  Second, KKO would construct the pulp mill.  KKO ascertained that it had to construct the sawmill before the pulp mill because the byproduct chips from the sawmill were a vital part of the raw material supply needed for the pulp mill.  KKO anticipated that it would construct and operate both the sawmill and the pulp mill alone, expecting that the sawmill's profits would be optimized by an adjacent pulp mill.

In connection with the two-step project, LRFP was formed, and it established relations with local suppliers of timber. LRFP also filed applications for air and water pollution permits and studied the requirements for an energy permit.  In 1975 or

1976, KKO received financing for the first step of the project through a $10 million loan from Aetna Life Insurance Co. (Aetna).

The sawmill was built near the end of 1976, and it commenced operations in January 1977. The sawmill generated losses in each of the years from 1977 through 1981; by the end of 1980, KKO had lost approximately $17.224 million. Due to these losses, KKO, around 1980, decided not to build the pulp mill on its own but to search for a partner. As of the end of 1980, KKO's investment in the sawmill project totaled $31.5 million.

In 1978, GNN had an adequate cash flow and wanted to undertake a major capital project. After studying several capital projects, GNN decided to build a pulp mill; GNN wanted to enter the pulp business because of projected worldwide shortages of pulp. Due to the enormous cost associated with constructing a pulp mill, GNN desired to obtain a partner for a joint venture to effectuate the construction. In about August or September 1980, GNN learned about KKO's interest in entering into a joint venture to build a pulp mill in Mississippi.

In the fall of 1980, KKO began serious discussions with GNN to build jointly a pulp mill on LRFP's Mississippi property. At that time, the parties believed that construction of the pulp mill would cost approximately $440 million. KKO's initial objective was a 20-percent equity relationship and long-term pulp supplies that would be 20 percent of the output of the intended mill. At this time, KKO was buying large quantities of pulp in

the open market and a long-term pulp contract would shore up its pulp requirements. KKO believed that the long term contract with LRFP would be strengthened by KKO having a minority interest in LRFP rather than creating a buyer-seller relationship.

On November 5, 1980, GNN and KKO signed a letter of intent (the Letter of Intent) to build jointly a pulp mill. The Letter of Intent contemplated that GNN would own 80 percent of the venture and KKO would own 20 percent, and that GNN and KKO would be responsible for their pro rata share of debt and equity. KKO desired to satisfy its 20-percent share of the equity by contributing its sawmill operations, the pulp mill site, existing environmental permits, and Finnish machinery. The Letter of Intent stated that GNN agreed with this proposal in principle, subject to a mutual determination of the value of the contributed assets. KKO proposed that GNN value the contributed assets at $31.5 million, which KKO represented to GNN was the total amount KKO had invested in LRFP.

When the parties contemplated the 80/20 split, they anticipated that KKO would participate in the project for the long run, and that KKO would be a true coventurer and equity participant in the project. KKO would also share any risk of loss in the project. The Letter of Intent stated that "If for any reason the project does not proceed, expenses incurred by either party shall be assumed by that party without reimbursement from the other party." The Letter of Intent also assured KKO a

long-term pulp supply relative to its ownership interest in the venture; the parties were to have access to the output of the pulp mill "in proportion to their interests in the venture and on mutually agreeable commercial terms."

GNN selected the engineering firm of Brown & Root to prepare preliminary studies of the parameters for the pulp mill and to prepare a detailed study to set the specifications and construction standards for the mill. The controller departments of GNN and KKO also prepared a joint financial projection in 1981, which projected the amount of retained earnings for their joint venture for each year through 1990. GNN's employees and officers anticipated that the venture would generally suffer losses from 1982 through 1989 and that LRFP would have negative retained earnings as of 1989.

In October 1981, Brown & Root reported substantial cost escalation in constructing the pulp mill, and the partnership proposal was revised so that KKO would have no debt portion. Later that year, KKO suggested to GNN that KKO sell the sawmill to GNN for cash and that negotiations continue only on a long-term pulp sales contract. GNN expressed a preference for a continued joint venture, mainly because of KKO's experience in building pulp mills; KKO had recently built a very large pulp mill in Finland and had the experience of procuring and using the latest equipment. KKO's recent experience in building a pulp

mill was an intangible asset that GNN wanted KKO to bring into a joint venture with GNN.

On December 31, 1981, GNN, LRC, KKO, Griffin, and LRFP entered into the Stockholders' Agreement (the Stockholders' Agreement) and the LRFP Stock Issuance Agreement (the Stock Issuance Agreement), and KKO and LRFP entered into the Pulp Sales Agreement.  On the same day, Griffin transferred property to LRFP valued at approximately $31.5 million in exchange for 5 percent of LRFP's common stock and 32.8 percent of LRFP's preferred stock, and LRFP assumed KKO's $10 million debt owed to Aetna. GNN transferred $56.7 million to LRFP in exchange for 95 percent of LRFP's common stock and a promise to pay $40 million in exchange for 67.2 percent of LRFP's preferred stock.

The relevant parts of the Stockholders' Agreement provide as follows:

> 1.  At the Closing * * * [Griffin] shall sell, assign and transfer to GNN all of its shares of common stock of LRC for the amount of $200.
>
> 2.  (a) Prior to the Closing KKO and [Griffin] shall cause a recapitalization of LRFP to take effect so that immediately prior to the Closing LRFP shall have an authorized capital consisting of 7,700 shares of preferred stock, without par value (the "Preferred Stock") and 4,500 shares of common stock, par value $1.00 per share (the "Common Stock"), of which 1,940 shares of the Preferred Stock and 208 shares of the Common Stock shall be issued and outstanding and owned of record and beneficially by [Griffin].
>
> > (b)  At the Closing LRFP shall issue and sell to LRC, 3,952 shares of the Common Stock for the amount of $56,700,000 and simultaneously therewith LRC shall subscribe

to 4,000 shares of the Preferred Stock to be purchased and paid for in ten equal quarterly installments of $4,000,000 each commencing March 1, 1983.

(c) At the Closing LRFP shall deliver the certificates evidencing LRC's shares of the Common Stock against payment to LRFP of cash in the amount of $56,700,00 so that at the conclusion of the Closing LRC shall own of record and beneficially ninety-five percent of the Common Stock and [Griffin] shall own of record and beneficially five percent of the Common Stock.

\*      \*      \*      \*      \*      \*      \*

4. LRFP shall be responsible for constructing and operating the Project. Unless otherwise agreed in writing by KKO, the scope of LRFP's commercial activities shall be the production and marketing directly or indirectly of any and all products and by-products relating to or arising out of the forest products industry including the transportation thereof in any manner.

5. All of the funds necessary to construct and operate the Project shall be provided to LRFP by LRC and nothing herein or in law shall be deemed to require Griffin to provide a pro rata portion of such funds whether as loans or advances or equity to LRFP. \* \* \*

\*      \*      \*      \*      \*      \*      \*

6. It is the intention of GNN and LRC to construct the Project in accordance with the Report but nothing herein shall be construed to require LRC or GNN to complete the Project in accordance with the Report or otherwise, to operate the pulp mill when constructed and completed and/or the sawmill owned by LRFP or use its efforts to operate the same or, if either or both be in operation, to keep LRFP well or otherwise supplied with funds of any kind, and LRC and GNN may terminate the Project or cease construction of the pulp mill or shutdown the pulp mill and/or the sawmill at any time or times without obligation or liability to any party hereto, all such decisions to be in the absolute discretion of LRC and GNN. \* \* \*

\*     \*     \*     \*     \*     \*     \*

9. (a) The Board of Directors of LRFP shall consist of ten persons, eight of whom shall be nominated by LRC (the LRC Directors), and two of whom shall be nominated by [Griffin] (the [Griffin] Directors). As long as LRC owns shares of the Preferred Stock and Common Stock, it will vote its shares so as to provide for the election of the two persons nominated by [Griffin], and as long as [Griffin] owns shares of the Preferred Stock and Common Stock, it will vote its shares so as to provide for the election of the eight persons nominated by LRC. \* \* \*

\*     \*     \*     \*     \*     \*     \*

(b) The by-laws of LRFP shall provide that a majority of the whole Board of Directors of LRFP shall constitute a quorum for the transaction of business and that the act of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors.

\*     \*     \*     \*     \*     \*     \*

10. The authorization of any of the corporate actions set forth below shall require the favorable vote or consent in writing of the holders of at least 96 percent of the outstanding shares of the Common Stock:

(a) Any merger or consolidation of LRFP which would reduce [Griffin's] interest in the Common Stock of LRFP to less than 5 percent or the dissolution or liquidation of LRFP.

(b) Any issuance by LRFP of additional shares of the Common Stock (except as stock-splits or stock dividends).

(c) Any method of financing LRFP involving the purchase by [Griffin] of additional securities of LRFP, but nothing herein shall preclude LRFP from issuing any securities of any kind, including additional shares of the Preferred Stock, to any person, provided the interest, dividend or other rate

of return on such securities shall not exceed the prime rate of interest of Irving Trust Company published from time to time plus 3/8ths of one percent and provided, further, that immediately after such issuance [Griffin's] interest in the Common Stock of LRFP shall not be reduced to less than 5 percent.

*     *     *     *     *     *     *

13.  If, after the close of any fiscal year ending after July 1, 1989, the independent auditors of LRFP certify that LRFP has earned a net profit after taxes, the Board of Directors of LRFP shall consider voting to declare a dividend to the holders of the Common Stock in an amount equalling not less than 40% of such after-tax profit unless LRFP's Executive Committee certifies, in writing, that part or all of such 40% portion of the net after-tax profit shall not be declared a dividend because such funds are required to be used, or to be reserved for, particular capital investments or that sufficient cash is not available in light of LRFP's other requirements.

*     *     *     *     *     *     *

15.  (b) GNN shall have responsibility for the management of LRFP and any of its subsidiaries.  * * *

16.  On not less than six months' written notice given to [Griffin] on and after January 1, 1989 LRC shall have the right to purchase all of [Griffin's] shares of the Preferred Stock and Common Stock of LRFP at the price of $10,000 per share for each of [Griffin's] shares of the Preferred Stock then owned by it and $58,894.23 per share for each of [Griffin's] shares of the Common Stock then owned by it plus five (5) percent of the retained earnings, if any, of LRFP as at the earnings date as hereinafter defined.

Similarly, on not less than six months' written notice given to LRC on and after January 1, 1989 [Griffin] shall have the right to sell all of [Griffin's] Preferred Stock and Common Stock of LRFP to LRC at the price of $10,000 per share for each of [Griffin's] shares of the Preferred Stock then owned by it and $58,894.23 per share for each of [Griffin's] shares of the Common Stock then owned by it plus five

(5) percent of the retained earnings, if any, of LRFP as at the earnings date.

In the event additional shares of Common Stock are issued to [Griffin] or [Griffin] receives additional shares of the Common Stock as a result of any stock split or stock dividend or [Griffin's] shares of the Common Stock are combined into a lesser number of shares, the price per share for each of [Griffin's] shares of the Common Stock set forth above shall be appropriately adjusted to reflect such issuance, stock split, stock dividend or combination of shares.

Such notice shall specify the closing date of the sale of [Griffin's] Preferred and Common Stock and the earnings date when the retained earnings of LRFP shall be determined, which date shall be the close of the calendar month preceding by not less than 30 nor more than 90 days the closing date. Prior to such closing date LRFP shall, if requested by [Griffin], declare and pay a dividend on the Common Stock equal to the amount of such retained earnings but only out of funds legally available therefor. On such closing date [Griffin] shall sell, assign and transfer to LRC and LRC shall purchase [Griffin's] shares of the Preferred and Common Stock of LRFP at the purchase price stated above, less the amount of the retained earnings received by [Griffin] as aforesaid.

*       *       *       *       *       *       *

20. Immediately after the closing under the Agreement, all certificates representing shares of the Stock registered in the name of [Griffin] shall bear the following legend on the face thereof:

The shares represented by this certificate are subject to the provisions set forth in the Stockholders' Agreement dated as of December 31, 1981 among Great Northern Nekoosa Corporation, Kymi Kymmene Oy, Leaf River Paper Company, Inc., Leaf River Corporation and Leaf River Forest Products, Inc., a copy of which has been deposited with Great Northern Nekoosa Corporation at its office at 75 Prospect Street, Stamford, Connecticut.

*       *       *       *       *       *       *

## Appendix I

The designations, preferences, privileges and voting powers, and the qualifications, limitations and restrictions thereof, of the Preferred Stock and the Common Stock shall be as follows:

### Preferred Stock

(a) <u>Dividends</u>.  The holders of record of the Preferred Stock shall be entitled to receive out of any funds of the Corporation at the time legally available for the declaration of dividends, non-cumulative dividends at the rate of six percent (6%) per annum per share, and no more, payable in cash when and as declared by the Board of Directors.  If dividends on the Preferred Stock are not declared in any fiscal year of the Corporation, they shall not accumulate, whether or not earned.  Nothing herein shall be construed to prohibit the Board of Directors from declaring, and the Corporation from paying or setting apart, dividends on the Common Stock, whether or not dividends on the Preferred have been declared.

(b) <u>Redemption</u>.  The Corporation may at any time redeem all, or may from time to time redeem in part, the shares of Preferred Stock at the redemption price of $10,000 per share, plus any dividends which have been declared and remain unpaid to the date fixed for redemption.  Notice of redemption of shares of the Preferred Stock and of the date and place of redemption shall be mailed not more than 60 nor less than 30 days prior to the date fixed for redemption to each holder of record of shares to be redeemed at his address as shown by the records of the Corporation.  If there is to be redeemed less than all of the shares then outstanding of the Preferred Stock, the shares to be redeemed shall be selected on a pro rata basis.

(c) <u>Dissolution</u>.  In the event of any voluntary or involuntary dissolution of the Corporation, the holders of shares of the Preferred Stock then outstanding shall be entitled to be paid out of the assets of the Corporation, before any payments shall be made to the holders of any shares of Common Stock, $10,000 per share, plus any dividends which have been declared and remain unpaid to the date of payment.  In the event that the assets of the Corporation are insufficient to pay the full amounts to which the

holders of the Preferred Stock shall be entitled in dissolution, then such assets shall be distributed to the holders of the Preferred Stock in proportion to the respective amounts which they would be entitled to receive if paid in full.  After the payment in full of the sum per share hereinabove described to the holders of record of the Preferred Stock then outstanding, the holders of outstanding shares of Common Stock of the Corporation shall be entitled to receive any balance of the assets then remaining and the shares of the Preferred Stock shall not be entitled to share therein. No liquidation or other act of the Corporation shall be construed as a dissolution, voluntary or involuntary, unless approved by the stockholders in the manner provided by law.

(d) <u>Voting Rights</u>.  Except as provided by law, the Preferred Stock shall not be entitled to vote.

Common Stock

(a) <u>Dividends</u>.  The holders of shares of Common Stock shall be entitled to receive dividends from time to time when and as declared by the Board of Directors out of funds legally available therefor.

(b) <u>Dissolution</u>.  In the event of any dissolution of the Corporation, after the debts of the Corporation shall have been paid or provided for, and after the holders of the Preferred Stock shall have received the preferential distribution to which they are entitled as hereinabove set forth, all of the remaining assets of the Corporation shall belong to and shall be distributed ratably among the holders of the Common Stock.  No liquidation or other act of the Corporation shall be considered as a dissolution, voluntary or involuntary, unless approved by the stockholders in the manner provided by law.

(c) <u>Voting Rights</u>.  At every meeting of the stockholders of the Corporation, the holders of record of shares of Common Stock entitled to vote thereat shall be entitled to one vote for each such share held.

Under the Pulp Sales Agreement, KKO agreed to purchase 80,000 short tons per year of the output of the pulp mill, and KKO was entitled to a 3-percent discount from the announced list

prices of the major American pulp companies; a 3-percent discount was commonly offered to purchasers of market pulp, and it did not represent a special price or discount resulting from KKO's interest in LRFP.  These benefits to KKO were for the full term of the Pulp Sales Agreement, and KKO's discount applied in both strong and weak markets.  The Pulp Sales Agreement also provided that either party could terminate the agreement only on 1-year's written notice given on or after July 1, 1999, in which case termination would take effect at the end of 5 years from the date of the notice.  Pulp shipments for the period following the date of the notice would be the same for the first 12 months and then be reduced cumulatively.

The pulp mill commenced operations in 1984.  In that year, KKO purchased 2,555 tons of pulp from LRFP, and, in the next year, KKO purchased 47,128 tons of pulp from LRFP.  The purchased pulp was an important source of supply to KKO.  In 1986, the markets improved, and LRFP began to develop new markets.  In late 1986, the parties to the Pulp Sales Agreement agreed to suspend the Pulp Sales Agreement for 1987, and, by mutual consent on December 31, 1987, the parties to the Pulp Sales Agreement terminated the agreement in toto.

In February 1988, Griffin notified GNN that it was going to exercise its put.  On January 2, 1989, Griffin did so, exercising its right to sell all of its common and preferred stock in LRFP on July 3, 1989, with an earnings date of May 31, 1989.  LRFP's

balance sheet dated May 31, 1989, reported negative earnings of $142.2 million and a negative net worth of $43.3 million. Because LRFP had no positive retained earnings on May 31, 1989, Griffin's right to 5 percent of the LRFP retained earnings was zero, and LRC paid Griffin $31.75 million on July 3, 1989, in exchange for Griffin's common and preferred shares in LRFP. On July 3, 1989, at the closing, Griffin delivered to GNN its LRFP share certificates and stock powers in consideration of $31.75 million in funds which GNN wired to Griffin's account. Griffin also gave GNN an officer's certificate dated July 3, 1989, certifying that the LRFP shares sold by Griffin to LRC were then owned by Griffin free and clear of all pledges, security interests, liens, encumbrances, restrictions on transfer and options or equities, or claims of others of whatsoever nature. GNN, in turn, prepared a closing memorandum stating that a closing was held on July 3, 1989, whereat LRC (on behalf of GNN) gave Griffin $31.75 million in exchange for Griffin's certificates representing 1,950 shares of preferred stock and 208 shares of common stock endorsed for transfer.

Griffin filed a consolidated Federal income tax return for 1989, based on the calendar year. Griffin reported a sale of its entire interest in LRFP for $31.75 million, resulting in a reported capital gain of $5,598,285. During the period January 1, 1982, through July 3, 1989, KKO's two representatives on LRFP's board of directors actively participated in the board

meetings and were treated as full members of the board.  In LRFP's minutes of its board's meetings on November 12, 1986, and November 11, 1987, Griffin was described as holding a stock interest in LRFP.

GNN's annual reports for 1981 through 1988 reported GNN as owning 95 percent of the voting stock of LRFP, and GNN's Federal income tax returns for 1982 through 1988 reported the same.  On its 1987 through 1989 returns, GNN treated the 1981 transaction as a sale of Griffin's shares in LRFP, and a portion of the deferred payment as unstated interest under section 483.  GNN concedes that its interest deductions in 1987 and 1988 were erroneous and argues only that it is entitled to its interest deduction in 1989.  On its 1989 return, GNN deducted $1,049,771 as unstated interest on the transaction with Griffin.  In its petition, GNN claims a 1989 unstated interest deduction of $16,477,615 with respect thereto, and that it has a $5,264,409 overpayment of income taxes for that year.

OPINION

We are asked to decide the timing of Griffin's sale of its LRFP stock to GNN.  GNN argues that it bought the stock in 1981 for a deferred payment of $31.75 million.  According to GNN, it assumed the benefits and burdens of owning Griffin's LRFP stock in 1981 because, as of December 31, 1981:  (1) There was only a remote possibility of nonexercise of the reciprocal options and (2) the Stockholders' Agreement had effectively shifted the

benefits and burdens of owning the stock from Griffin to LRC. Respondent and Griffin counter that Griffin sold the subject stock to GNN in 1989 for $31.75 million. Respondent and Griffin argue that the benefits and burdens of owning the subject stock shifted in 1989 upon the exercise of the put. According to respondent, the legal title and beneficial ownership of the subject stock in 1981 resided in Griffin, although GNN had the greater opportunity for gain and risk of loss. Griffin contends that the intention of the parties and the form of the transaction indicate that the sale occurred in 1989.

We agree with Griffin and respondent that the sale occurred in 1989.[3] A sale of property occurs for Federal income tax purposes when the benefits and burdens of owning the property shift from the seller to the buyer. Dettmers v. Commissioner, 430 F.2d 1019, 1023 (6th Cir. 1970), affg. Estate of Johnson v. Commissioner, 51 T.C. 290 (1968); Lowe v. Commissioner, 44 T.C. 363, 369 (1965); Merrill v. Commissioner, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964). This Court has considered the following factors in passing on the time of such a shift: (1) Whether legal title passes, Grodt & McKay Realty,

_____

[3] At the outset, we note that we disagree with Griffin and respondent that GNN is attempting to disregard the form of the transaction in violation of Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965). Danielson is inapplicable to this case because the issue rests on the tax consequences of the 1981 Agreements. GNN is not seeking to disavow the terms of the contract. This case turns on the effect of the terms of the Stockholders' Agreement.

Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981); (2) the manner in which the parties treated the transaction, id.; (3) whether the sale price is fixed, Clodfelter v. Commissioner, 48 T.C. 694, 701 (1967), affd. 426 F.2d 1391 (9th Cir. 1970); (4) whether a significant amount of the agreed price has been paid, Hay v. Commissioner, 25 B.T.A. 96, 101 (1932); (5) the intention of the parties, Merrill v. Commissioner, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964); (6) descriptive terms used in the agreement, Clodfelter v. Commissioner, supra; and (7) whether an effective date has been agreed upon fixing a specific time for recognition of the rights and obligations of the parties, id.

Our analysis of the facts of this case, in conjunction with our analysis of these factors, points overwhelmingly to the conclusion that the subject sale occurred in 1989. The Stockholders' Agreement explicitly provides that the benefits and burdens of Griffin's ownership in its LRFP stock did not pass until 1989 when it exercised its put, and almost every stock benefit resided in Griffin until that time. Griffin was the legal and beneficial owner of its LRFP stock. Griffin held the stock. Griffin occupied two seats on LRFP's board of directors, an officer position, and one seat on the executive committee. Griffin would receive any dividends declared on the stock. Griffin could sell its stock to a third party. Griffin could block liquidation, stock dilution, merger, issuance of additional

shares, and certain methods of financing. If GNN desired to sell more than 50 percent of its stock to a third party, Griffin could compel GNN to compel the third party to purchase Griffin's shares on the same terms. The Stockholders' Agreement also did not list a due date for payment of the ultimate purchase price, an exact purchase price, or the right for GNN to sell Griffin's stock interest or receive profits attributable to Griffin's stock interest. In addition, the Stockholders' Agreement did not refer to the 1981 transaction as a sale, and we know, from reading the agreement repeatedly, that the parties thereto knew how to use the various forms of the verb "to sell" when they wanted to.

Nor do we find much of the traditional indicia surrounding a debtor/creditor relationship to support GNN's position that it was a debtor of Griffin to the tune of at least $31.5 million. We find no promissory note evidencing the purported debt, no security, no fixed price, and no stated interest. Indeed, if we were to accept GNN's position that Griffin sold GNN net assets of $21.5 million in 1981 for a deferred payment of $31.75 million that was payable at the earliest on July 1, 1989, we would be finding that the interest rate on GNN's debt was a mere 5.2 percent compounded daily.[4] We decline to find such a low

---

[4] We use the following formula to compute this rate of interest: $F = P(1 + i/n)^{ny}$, where "F" is the future payment ($31.75 million), "P" is the principal of the loan ($21 million), "i" is the annual interest rate (5.2%), "n" is number of times in a year that interest is compounded (365), and "y" is the number

(continued...)

interest rate as a fact without persuasive evidence. Although the Stockholders' Agreement also allowed Griffin to collect 5 percent of LRFP's retained earnings, in the case of profitable years, we find this fact unavailing seeing that Griffin anticipated that retained earnings would be negative throughout the relevant years.

It also is relevant that Griffin at all times considered itself to be the owner of 5 percent of the common stock and 32.8 percent of the preferred stock. GNN recognized consistently that it owned 95 percent of the voting common stock on its tax returns and in its financial statements, and GNN never told Griffin that it considered that it had purchased 100 percent of the voting common stock and 100 percent of the preferred on December 31, 1981. Indeed, it was not until 1987, 5 years after the agreements were executed, that LRFP first made an entry on its books indicating a 1981 purchase of Griffin's stock.

This case is similar to that of Penn-Dixie Steel Corp. v. Commissioner, 69 T.C. 837 (1978).[5] In Penn-Dixie, the Court held that reciprocal put and call options did not constitute a sale

---

[4](...continued)
of years until payment (7.5).

[5] GNN is mistaken in relying on Kwiat v. Commissioner, T.C. Memo. 1992-433, to support its contention that the benefits and burdens of ownership passed in 1981. In that case, the "pertinent inquiry" was "whether the purported lessor maintained the risk of economic depreciation and benefit of appreciation at the end of the lease term." Id. That is not the case here.

because the "arrangement did not legally, or as a practical matter, impose mutual obligations * * * to sell and * * * to buy * * * [and] each party's obligation to act was contingent upon exercise of the put or call, an event which might well fail to occur."  Id. at 844-845.  The same is true here.  When viewed from the perspective of December 31, 1981, the open-ended options may never have been exercised.  To the extent that GNN's expert, Daniel Frisch, testified to the contrary, we find this testimony unpersuasive.  Among other things, Mr. Frisch assumed that GNN would always have the $31.5 million in funds necessary to exercise its call.  Mr. Frisch also failed to account properly for the real-life possibility that, even though GNN's call may have been "in the money", GNN may have declined to exercise its call because the rate of return on an alternative investment of the $31.5 million may have exceeded GNN's cost of declining to exercise its call.

We hold that the sale occurred in 1989.  In so holding, we have considered all arguments made by GNN for a contrary holding and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered under Rule 155 in docket No. 17763-95; decision will be

<u>entered for respondent in</u>

<u>docket No. 18532-95</u>.